[No. D050150. Fourth Dist., Div. One. Feb. 26, 2008.]

THE PEOPLE, Plaintiff and Appellant, v.
FELIPE DEJESUS PAREDES, Defendant and Respondent.

COUNSEL

Bonnie M. Dumanis, District Attorney, Catherine Stephenson, Craig E. Fisher and James E. Atkins, Deputy District Attorneys, for Plaintiff and Appellant.

Patrick Morgan Ford for Defendant and Respondent.

OPINION

AARON, J.—

## I.

## INTRODUCTION

Felipe Dejesus Paredes pled guilty to voluntary manslaughter in 1987. At that time, Paredes was a legal permanent resident of the United States. As part of the plea agreement, the trial court agreed to issue a judicial recommendation against deportation (JRAD). Under then existing federal law, the JRAD precluded the federal government from removing Paredes from the United States. After accepting Paredes's plea, the trial court granted Paredes probation, subject to various conditions, including that he serve 365 days in custody.

Federal law pertaining to immigration consequences for convictions for certain criminal offenses subsequently changed. As a result, Paredes became potentially subject to removal from the United States. After the federal government obtained an order directing Paredes's removal, Paredes filed a motion in the trial court in which he claimed that the People had breached "the no deportation promise" contained in his plea agreement. Paredes requested various forms of relief, including that his initial sentence be

vacated, and that he be resentenced to 364 days in custody. Paredes contended that a sentence of less than a year in custody might protect him from removal under current federal law. The trial court granted Paredes's motion, vacated his 1987 sentence of 365 days in custody as "legally invalid," and sentenced Paredes, nunc pro tunc to the time of his original sentencing date, to 364 days in custody.

On appeal, the People claim that the trial court erred in granting Paredes's motion because there was no violation of the plea agreement. Specifically, the People contend that the plea agreement did not contain a promise that Paredes would not be deported. In addition, the People note that the trial court informed Paredes at the time he pled guilty that his conviction could result in his deportation. The People contend that the retroactive change in federal law thus did not result in a violation of the plea agreement. We agree. Paredes's difficulties with his immigration status stem from the potential applicability of a retroactive change in federal law, not from a breach of his plea agreement. Accordingly, the trial court erred in vacating Paredes's initial sentence and resentencing him on the ground that such action was necessary to fulfill the plea bargain's "promise of no deportation."[1]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Paredes's plea of guilty to voluntary manslaughter*

In June 1987, the People filed an information charging Paredes with the murder of his wife. The People also alleged that Paredes personally used a dangerous or deadly weapon within the meaning of Penal Code section 12022, subdivision (b)[2] during the commission of the offense.

On August 10, 1987, the People and Paredes entered into a plea agreement. The parties identified the terms of the agreement on a written change of plea form that provides in relevant part: "DEFENDANT WILL PLEAD GUILTY

---

[1] The People also claim that the trial court acted in excess of its jurisdiction by modifying a term of Paredes's probation after probation had terminated and that the court erred in issuing a nunc pro tunc order and in issuing a writ of error *coram nobis*. The People further claim that the trial court violated this court's decision in *People v. Borja* (2002) 95 Cal.App.4th 481 [115 Cal.Rptr.2d 728] (*Borja*), which involves a trial court's authority to resentence a defendant in order to avoid immigration consequences. We discuss *Borja* in part III., *post*. However, in light of our conclusion that there was no violation of Paredes's plea agreement, we need not consider any of the People's additional arguments for reversing the trial court's order.

[2] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

TO [SECTION] 192, [SUBDIVISION] (A) (VOLUNTARY MANSLAUGH-TER); PEOPLE COMMIT TO MIDTERM LID (6 YEARS); PEOPLE WILL DISMISS ALLEGATION OF [SECTION] 12022[, SUBDIVISION] (B) [AND] COURT AGREES TO [A] JUDICIAL RECOMMENDATION AGAINST DEPORTATION."

In a section entitled, "CONSEQUENCES OF PLEA OF GUILTY OR NO CONTEST," the change of plea form provides, "9. I understand that if I am not a citizen of the United States, a plea of Guilty or No Contest could result in deportation, exclusion from admission to this country, and/or denial of naturalization." Paredes initialed a box next to this statement.

In a section entitled "PROSECUTOR'S STATEMENT," the form states, "The People . . . concur[] in the defendant's plea of Guilty/No Contest as set forth above." The prosecutor signed the form next to this statement.

That same day, the sentencing judge held a plea hearing. At the outset of the hearing, the judge examined the change of plea form. The judge stated, "I can see that paragraph nine is signed, indicating that if he was not a citizen a plea of guilty could prevent him from becoming a citizen and that could lead to deportation." During the hearing, the judge admonished Paredes regarding the possible immigration consequences of his plea, as follows:

"[The Judge]: Do you understand that if you are not a citizen—let me advise you that a conviction of this offense which you have been charged with may have the consequences of deportation, exclusion from admission to the United States or denial of naturalization pursuant to the laws of the United States? Do you understand that?

"[Paredes]: Yes.

"[The Judge]: All right. I indicated to your attorney in chambers on Friday that the court will make a recommendation against your deportation. Have you talked about this case with your attorney?

"[Paredes]: I just mentioned to him that an immigration officer told me that if I was sentenced for more than a year, that they could take away my residency card.

"[The Judge]: I wasn't talking about just your residency but have you had an opportunity to talk to your attorney not only about the residency but also about the facts of the charges against you, in court?"

"[Paredes]: Yes."

After finishing the plea colloquy, the judge accepted Paredes's plea of guilty to voluntary manslaughter and set the matter for sentencing.

### B. *The sentencing court's initial pronouncement of judgment*

In September 1987, Paredes filed a brief in support of a motion for a JRAD, pursuant to title 8 United States Code former section 1251(b).[3] In November 1987, the United States Immigration and Naturalization Service (INS)[4] filed a brief opposing Paredes's motion for a JRAD.

On December 8, 1987, the sentencing court pronounced judgment. The court suspended imposition of sentence and granted Paredes probation, subject to various conditions, including that he be committed to the custody of the sheriff for 365 days. The trial court also issued a JRAD.

### C. *Immigration proceedings*

Sometime prior to 2004, Paredes applied to become a citizen of the United States.[5] Thereafter, the Department of Homeland Security initiated removal proceedings against Paredes. On July 19, 2005, a federal immigration judge ordered Paredes removed from the United States. The immigration judge reasoned in part:

"The crux of [Paredes's] argument as it relates to his deportability is that the JRAD issued by the sentencing court precludes his removal, despite the fact that the involuntary[6] [*sic*] manslaughter conviction is now classified as an aggravated felony crime of violence as provided in [8 United States Code section 1101] (a) (43)(F) . . . .

"[Paredes's] argument is understood but rejected. In [*U.S. v. Hovsepian* (9th Cir. 2004) 359 F.3d 1144 (en banc)], the Court of Appeals decided that an alien who was issued a JRAD based on a conviction of a specified crime was

---

[3] As discussed in greater detail in part III.B.3., *post*, title 8 United States Code former section 1251(b) authorized courts, including state courts, to issue "recommendations," against deportation. Such recommendations had the legal effect of precluding the federal government from deporting a defendant on the basis of a conviction for an offense that was otherwise deportable.

[4] "On March 1, 2003, the INS was dissolved as an independent agency within the United States Department of Justice, and its functions were transferred to the Department of Homeland Security. Homeland Security Act of 2002, Pub.L. No. 107-296, § 471, 116 Stat. 2135." (*Navarro-Lopez v. Gonzales* (9th Cir. 2007) 503 F.3d 1063, 1066, fn. 2 (en banc).)

[5] The precise dates on which various events occurred during the immigration proceedings involving Paredes are not clear from the record.

[6] It is undisputed that Paredes was convicted of *voluntary* manslaughter, rather than *involuntary* manslaughter as stated by the immigration judge.

not insulated from deportation when, at a later date, the specified crime fell into a new category of offenses where the JRAD would not be applicable. Following this reasoning, it has been decided that [Paredes] is properly removable as charged because his involuntary [*sic*] manslaughter conviction is now classified as an aggravated felony."

In August 2006, the Board of Immigration Appeals affirmed the immigration judge's decision. Paredes filed an appeal of that decision to the United States Court of Appeals for the Ninth Circuit. As of December 2006, Paredes's appeal was pending in the Ninth Circuit.[7]

D. *Paredes's initial motion to vacate his conviction and reinstate a plea of not guilty, or in the alternative, to enforce the plea bargain*

In August 2006, Paredes filed a motion entitled "Motion to Vacate Conviction and Reinstate Plea of Not Guilty or Enforce Plea Bargain." In his motion, Paredes argued that the People had agreed that the trial court would issue a JRAD as part of his plea bargain in the case. Paredes contended in his moving papers that his guilty plea was premised principally on "an agreement that this conviction would have no immigration consequences . . . ." Paredes claimed that, "[b]y failing to take action to honor the essence of this agreement, the government has now breached its agreement." Paredes argued that under these circumstances, he was "entitled to withdraw his plea in light of the change in the law resulting in his harsher punishment or the court can impose specific performance." With respect to his request for specific performance, Paredes stated, "There is a simple fix to restore the benefit of the bargain: allow Mr. Paredes to withdraw his plea, he can plead anew to the same charge but sentence him to a sentence that does not impact immigration."

Paredes also argued that the doctrine of promissory estoppel supported his request to either withdraw his plea or for the court to order specific performance of the plea agreement. Paredes maintained that he had relied on "the no deportation promise of the JRAD," in pleading guilty and in seeking United States citizenship. Finally, Paredes argued that he had not received the "benefit of the bargain," which he described as "no deportation."

At the time Paredes pled guilty, pursuant to federal law, the JRAD constituted a bar to deportation premised on the conviction Paredes incurred as a result of his plea. Federal law subsequently changed, rendering Paredes potentially eligible for mandatory removal from the United States, notwithstanding the JRAD.

---

[7] The decision of the Board of Immigration Appeals is not in the record. The record does not indicate whether the Ninth Circuit has acted on Paredes's appeal.

The People filed an opposition to Paredes's motion. Among other arguments, the People claimed that they had not violated the terms of the plea agreement. The People argued that Paredes "fail[ed] to explain how changes in federal immigration law constitute a breach by the San Diego District Attorney's Office," and pointed out that all of the terms of Paredes's plea bargain had been fulfilled, including that the trial court would issue a JRAD. The People further noted that Paredes had been advised of the potential immigration consequences of his plea prior to pleading guilty, and that Paredes's immigration predicament stemmed from a change in federal law rather than from a breach of the plea agreement. The People also argued that Paredes's motion was not timely and that the trial court lacked jurisdiction to resentence Paredes, since Parades had completed his term of probation.

E. *The evidentiary hearing on Paredes's motion*

On October 10, 2006, the trial court held an evidentiary hearing on Paredes's motion. At the hearing, Michael Meaney, who was Paredes's defense attorney in the 1987 criminal proceedings, testified. Meaney stated that the plea agreement had been reached through negotiations with Prosecutor Julie Saake. Meaney also testified that the JRAD was important to Paredes. Paredes's counsel asked Meaney whether "the fact that the plea bargain included a [JRAD] and that he would be safe from immigration consequences," was a "substantial part of the inducement" for Paredes to enter his plea. Meaney responded in the affirmative, noting the language of the plea agreement. Meaney explained that it was unusual for a plea agreement to specifically mention a JRAD.

Meaney also testified that everything he had stated in a declaration filed with Paredes's motion was true and accurate. In that declaration Meaney stated, "It was my understanding that in entering into this plea bargain, irrespective of what sentence Mr. Paredes might ultimately receive, that he would not be deported from the United States."

Former Deputy District Attorney Saake also testified. Saake agreed that the JRAD was an "essential term" of Paredes's plea bargain. Saake explained that it was unusual for a plea bargain to specifically mention the issuance of a JRAD. The prosecutor asked Saake, "Did you agree that this defendant would not be deported?" Saake responded, "I never made that express agreement."

John Shorkey, who served as Paredes's immigration lawyer during some of the proceedings prior to Paredes's filing his appeal in the Ninth Circuit, also testified at the hearing. Shorkey testified with respect to the timing of various immigration proceedings and their relationship to Paredes's decision to file the motion to vacate his conviction in this case.

### F. *The parties' supplemental briefing in the trial court*

On October 16, 2006, Paredes filed a brief entitled, "Supplement to Previously Filed Motion to Vacate Conviction and Reinstate Plea of Not Guilty or Enforce Plea Bargain." In his brief, Paredes stated that he did not wish to "withdraw his previously entered plea of guilty but simply [wanted] to enforce the terms of the plea bargain in his case." Paredes requested that "all references to withdrawing his plea [in his initial motion be] ignored" and stated that the only relief sought was specific enforcement. Paredes also provided a description of numerous cases that he claimed were relevant to various legal issues pertaining to his motion. Specifically, Paredes claimed that several of the cases demonstrated that the trial court had jurisdiction to act on his motion, and that other cases demonstrated that his motion was timely.

On October 24, 2006, the People filed a supplemental brief in which they reiterated their argument that the trial court had advised Paredes of the potential immigration consequences of his guilty plea at the time he pled guilty, and that Paredes had acknowledged these consequences. The People also reiterated their argument that the trial court lacked jurisdiction to grant relief to Paredes, and discussed the cases Paredes cited in his brief. In particular, the People argued that Paredes was not entitled to relief by way of writ of error *coram nobis* because, among other reasons, he had not filed a writ petition.

On October 27, 2006, Paredes filed a response to the People's brief in which he renewed his request that the court "consider all remedies at his disposal, including withdrawal of the plea." Returning to the issue of the trial court's jurisdiction to act, Paredes claimed that the trial court had "non-statutory inherent power to correct constitutional violations." In addition, Paredes argued that his motion was "in essence" a petition for writ of error *coram nobis* and that he was entitled to writ relief. Finally, Paredes argued that he had not fully understood the trial court's admonition pursuant to section 1016.5 concerning the potential immigration consequences of a guilty plea at the time he pled guilty.

On November 2, 2006, the People filed an additional brief in which they objected to Paredes's attempt to pursue "new and different remedies under the guise of 'supplemental briefing.' " The People also argued that Paredes had still failed to demonstrate that the trial court had jurisdiction to afford him any of the relief he requested.

The following day, Paredes filed a "final brief," in which he reiterated his argument that the trial court had jurisdiction to grant the relief he requested, pursuant to section 1016.5 and as a writ of error *coram nobis*.

### G. *The additional hearings*

On November 6, 2006, the court held a hearing and heard argument from Paredes's counsel and the People. The court issued an oral tentative ruling granting Paredes's motion, and instructed Paredes's counsel to prepare proposed findings of fact and conclusions of law in accordance with the court's statements. On November 13, 2006, the court held an additional hearing for the purpose of clarifying its tentative ruling.

On December 12, 2006, the court held another hearing at which it stated that it had reviewed Paredes's proposed findings of fact and conclusions of law, and the People's objections thereto.[8] The court noted that there were "substantial differences" in the parties' positions. The court asked the parties whether there was any chance that they would agree on the contents of the final order. When the parties indicated that such agreement was unlikely, the court responded that it would revise Paredes's proposed order and issue a final order.

### H. *The trial court's final order granting Paredes's motion*

On January 4, 2007, the trial court issued findings of fact, conclusions of law, and a final order granting Paredes's motion.

In its findings of fact, the court found that the JRAD was a bargained-for and material term of the plea bargain. The court further found that Paredes "pled guilty, in large part, because of the availability of the JRAD and its protection from future deportation consequences." In addition, the court found that at the time Paredes pled guilty, "he understood that his bargain protected him against deportation in the future. . . ." The court further found that at the time of the plea, "none of the parties anticipated that the law would change to prevent compliance with this material term of no deportation." The court also found that it appeared the JRAD would no longer protect Paredes from deportation.

In its conclusions of law, the court stated, "[H]ad the parties known that a sentence of 364 days in custody would have carried out the parties' intentions, it is safe to say this sentence would have been imposed by [the sentencing judge]." The court determined, "[I]f the record is not corrected and the plea bargain enforced, Mr. Paredes will suffer violations of his Federal Constitutional Rights of due process and equal protection." In addition, "a miscarriage of justice" would occur. The trial court concluded,

---

[8] Paredes's proposed findings of fact and conclusions of law are not contained in the record on appeal.

"The promise of no deportation, embodied in the form of a JRAD, was a material term of the plea bargain and as such, case law . . . dictate[s] that this promise must be fulfilled."

With regard to the appropriate relief, the court stated:

"The remedies available to the court to address the *Writ of Error* [*Coram*] *Nobis* and the constitutional violations are as follows: 1) correct the sentence to reflect and enforce the terms of the plea bargain; 2) allow the plea to be withdrawn; or 3) dismiss the case entirely in the interests of justice per Penal Code [s]ection 1016.5;

". . . This court finds and concludes that all three remedies are appropriate and intends to order said remedies in the order listed above. A sentence modification squarely addresses the material error in this case as well as the constitutional violations. It restores the settled expectations of the parties and averts prejudice to all that will be incurred by reprocessing this case through the criminal justice system almost twenty years after the fact. It is the first and appropriate remedy under the unusual circumstances of this case."

The court's order states in relevant part, "The sentence imposed on December 8, 1987 is vacated as legally invalid. Mr. Paredes is sentenced to 364 days in custody, *nunc pro tunc*, to December 8, 1987 with credit for time served."

III.

DISCUSSION

*There has been no breach of Paredes's plea agreement*

The People contend that the trial court erred in granting Paredes's motion because the subsequent change in federal law does not constitute a violation of Paredes's plea agreement.

A.  *Applicable law*

1.  *Standard of review*

■    "[A] plea agreement is interpreted according to the same rules as other contracts . . . ." (*People v. Toscano* (2004) 124 Cal.App.4th 340, 344 [20 Cal.Rptr.3d 923] (*Toscano*); accord, *People v. Vargas* (2001) 91 Cal.App.4th 506, 533 [110 Cal.Rptr.2d 210] [" ' " 'A plea agreement is, in essence, a

contract between the defendant and the prosecutor to which the court consents to be bound.' " ' "].)

In interpreting the plea agreement in this case, we apply the ordinary standards of review applicable in cases involving the interpretation of contracts generally. (See *Toscano, supra,* 124 Cal.App.4th at p. 345.) "[T]he 'interpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence.' " (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 520 [132 Cal.Rptr.2d 151], quoting *Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843 [102 Cal.Rptr.2d 468].) "In contrast, '[i]f the parol evidence is in conflict, requiring the resolution of credibility issues, we would be guided by the substantial evidence test. [Citation.]' [Citation.] However, extrinsic evidence is not admissible to ascribe a meaning to an agreement to which it is not reasonably susceptible. [Citation.]" (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1267 [35 Cal.Rptr.3d 343].)

### 2. *The law governing the enforcement of plea bargains*

It is settled that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." (*Santobello v. New York* (1971) 404 U.S. 257, 262 [30 L.Ed.2d 427, 92 S.Ct. 495].) "The [United States] Supreme Court has thus recognized that due process applies not only to the procedure of accepting the plea [citation], but that the requirements of due process attach also to implementation of the bargain itself. It necessarily follows that violation of the bargain by an officer of the state raises a constitutional right to some remedy." (*People v. Mancheno* (1982) 32 Cal.3d 855, 860 [187 Cal.Rptr. 441, 654 P.2d 211]; accord, *People v. Walker* (1991) 54 Cal.3d 1013, 1024 [1 Cal.Rptr.2d 902, 819 P.2d 861] ["When a guilty plea is entered in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties, including the state, must abide by the terms of the agreement."].)

Paredes relies on *People v. Arata* (2007) 151 Cal.App.4th 778, 781 [60 Cal.Rptr.3d 160] (*Arata*), in which, applying this case law, the court held that a retroactive application of an amendment to California law would violate the terms of a defendant's plea bargain, and thereby violate due process. The defendant in *Arata* pled guilty to a violation of section 288. At the time of the defendant's guilty plea, defense counsel stated that the defendant was entering the plea " 'with the understanding that the Court would order a . . . section 288.1 report. There would be no State Prison at the outset as a promise. And other than that agreement, it would be up to the Court in a

sentencing hearing to decide what happens to [the defendant].' " (*Arata, supra*, 151 Cal.App.4th at p. 781.) At sentencing, the trial court found the defendant eligible for probation based on the section 288.1 report, and granted him probation. (*Arata, supra*, 151 Cal.App.4th at p. 781.)

After the defendant successfully completed probation, he moved to withdraw his guilty plea and to dismiss the charge, pursuant to section 1203.4. (*Arata, supra*, 151 Cal.App.4th at p. 781.) Section 1203.4 provides generally that defendants who successfully complete probation are entitled to have their convictions expunged. (*Arata, supra*, 151 Cal.App.4th at pp. 782–783.) However, sometime after the defendant pled guilty, the Legislature amended section 1203.4 to make expungement relief unavailable, retroactively, to persons who had been convicted of a violation of section 288. (*Arata, supra*, 151 Cal.App.4th at pp. 782–783.) The trial court denied the defendant's motion, ruling that section 1203.4 relief was not available to the defendant in light of his section 288 conviction and the statutory amendment. (*Arata, supra*, 151 Cal.App.4th at p. 782.) On appeal, the *Arata* court concluded that the availability of section 1203.4 relief was a term of the plea bargain. The court reasoned: "The Attorney General argues that 1203.4 relief was not a part of the plea bargain as it was not mentioned. Not all terms of a plea bargain have to be express; plea bargains may contain implied terms. . . . Section 1203.4 relief is part of the bargain made with a probationer. [Citation.] By agreeing to give defendant probation, the plea bargain implicitly included the promise of section 1203.4 relief as part of probation. Section 1203.4 relief was within 'defendant's contemplation and knowledge' when he entered his plea. [Citation.]" (*Arata, supra*, 151 Cal.App.4th at p. 787.)

The *Arata* court further concluded that the availability of relief under section 1203.4 was significant in the context of the plea bargain in that case. (*Arata, supra*, 151 Cal.App.4th at p. 788.) The court held, "Since defendant's plea rested in a significant degree on the promise of eventual section 1203.4 relief, such promise must be fulfilled." (*Ibid.*) The *Arata* court reversed and remanded the case with directions for the trial court to grant the defendant's motion pursuant to section 1203.4. (*Arata, supra*, 151 Cal.App.4th at p. 789.)

### 3. *Relevant federal immigration law*

Until 1990, federal law precluded the deportation of aliens who were convicted of certain crimes where the sentencing court properly issued a JRAD. At the time Paredes pled guilty, title 8 United States Code former section 1251 (1987) provided in relevant part:

"(a) General classes:

"Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—[¶] . . . [¶]

"(4) is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor

in a prison or corrective institution, for a year or more, or who at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial; [¶] . . . [¶]

"(b) Nonapplicability of subsection (a)(4)

"The provisions of subsection (a)(4) of this section respecting the deportation of an alien convicted of a crime or crimes shall not apply . . . if the court sentencing such alien for such crime shall make, at the time of first imposing judgment or passing sentence, or within thirty days thereafter, a recommendation to the Attorney General that such alien not be deported, due notice having been given prior to making such recommendation to representatives of the interested State, the Service, and prosecution authorities, who shall be granted an opportunity to make representations in the matter."

"[W]hile [title 8 United States Code former section] 1251(b) speaks in terms of the sentencing court's making a 'recommendation,' it is a recommendation that is binding on the Attorney General, for the section has consistently been interpreted as giving the sentencing judge conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation. [Citations.] Those in charge of the deportation process, the immigration judge, the INS, the Attorney General, are given no authority to reject or disregard the recommendation; if the sentencing judge, having followed the procedures prescribed by the section, 'recommends' against deportation, the Attorney General is simply not allowed to use the conviction as a basis for deportation." (*Janvier v. United States* (2d Cir. 1986) 793 F.2d 449, 452; see also *U.S. v. Yacoubian* (9th Cir. 1994) 24 F.3d 1, 6 (*Yacoubian*) [recognizing that a JRAD must be " 'given absolute binding effect upon deportation efforts by the I.N.S.' on the basis of [grounds specified in] 8 U.S.C. § 1251(a)(4)"].)

■ In 1988, Congress amended title 8 United States Code former section 1251(a)(4) to make deportable any alien "convicted of an aggravated felony at any time after entry." (Pub.L. No. 100-690, § 7344(a) (Nov. 18, 1988) 102 Stat. 4181, 4471.) In 1990, Congress prospectively repealed the JRAD statute, effective November 29, 1990. (Pub.L. No. 101-649, § 505 (Nov. 29, 1990) 104 Stat. 4978, 5050.) Finally, in 1996, Congress retroactively expanded the definition of an aggravated felony to include, inter alia, crimes of violence resulting in a term of imprisonment of at least one year. (Pub.L. No. 104-208, § 321(a) (Sept. 30, 1996) 110 Stat. 3009, 3009-546, 3009-627 to 3009-628 (codified at 8 U.S.C. § 1101(a)(43)(F)).)

### 4. *People v. Borja*

In *Borja, supra*, 95 Cal.App.4th 481, this court considered whether a trial court had acted properly in modifying a defendant's sentence from 365 days to 364 days in response to changes in federal immigration law. In 1994, the defendant pled guilty to driving under the influence and admitted having suffered three prior convictions for the same offense. (*Id.* at p. 483.) At the time the defendant entered his guilty plea, he acknowledged that his plea could result in immigration consequences, including deportation. (*Ibid.*) At sentencing, the trial court sentenced the defendant to 16 months in prison, suspended execution of the sentence, and granted probation, conditioned on, among other terms, the defendant serving 365 days in local custody. (*Ibid.*)

In 2000, the defendant filed a motion in the trial court in which he maintained that he had not acted knowingly and voluntarily in pleading guilty because neither the court nor his counsel had fully advised him of all of the possible immigration consequences that could result from his plea. (*Borja, supra*, 95 Cal.App.4th at p. 483.) The defendant claimed that he was now facing mandatory deportation for his 1994 conviction as a result of changes in federal immigration law that occurred in 1996. (*Id.* at p. 484.) The defendant claimed that the INS had advised him that the only way that he could avoid deportation was to have his sentence reduced to 364 days. (*Ibid.*) The trial court subsequently issued an order, nunc pro tunc to the date of the original sentencing hearing, modifying the defendant's sentence to 364 days. (*Ibid.*)

On appeal, this court concluded that the trial court had erred in modifying the defendant's sentence. (*Borja, supra*, 95 Cal.App.4th at p. 487.) In rejecting the defendant's argument that the modification was justified on the ground that he had not been fully informed of all potential immigration consequences, the *Borja* court stated: "A criminal defendant must be informed there may be immigration consequences as a result of pleading guilty and is entitled to have the judgment vacated if he was not so informed and was prejudiced. (§ 1016.5, subds. (a), (b); *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 191 [96 Cal.Rptr.2d 463, 999 P.2d 686].) Here, Borja was informed that his guilty plea could have immigration consequences, including deportation. Borja has raised no complaints about what he was told at the time he pleaded guilty. Rather, his complaints revolve around subsequent changes in the immigration laws. Obviously, neither the court nor his defense counsel had a duty to divine these changes in the law. All that they could do and were expected to do was to inform Borja that his guilty plea could have immigration consequences, including possible deportation, in the future." (*Borja, supra*, 95 Cal.App.4th at pp. 485–486.)

The *Borja* court also stated that changes in federal immigration law did not justify modifying the defendant's sentence: "Borja's argument is not directed at any problems in the state court involving his guilty plea. Rather, Borja's argument is addressed to changes in federal law. . . . Borja's justification for seeking a reduction in his sentence is that it would be unfair to retroactively apply these changes in the immigration laws to him. Whether the immigration law should be applied retroactively to persons who pleaded guilty before the effective dates of the changes is an argument that should be made to the federal, not the state, court. The state court had no power to make that decision or to alter federal law. The fact that federal laws had changed was not a valid ground for altering the record of Borja's conviction and retroactively reducing his sentence." (*Borja, supra,* 95 Cal.App.4th at p. 486, fn. omitted.)

B. *There has been no violation of the plea agreement in this case*

The basis for the trial court's conclusion that the change in federal law resulted in a violation of the plea agreement was the court's determination that the plea agreement contained a "material term of no deportation." However, the change of plea form does not contain a promise of "no deportation." On the contrary, Paredes acknowledged on the change of plea form that his plea "could result in deportation." The change of plea form does state that the court will issue a JRAD. That promise has not been breached. The trial court did issue a JRAD.

Further, there were no statements made at the plea hearing that indicate that either the People or the trial court promised Paredes that he would not be deported. On the contrary, the trial court admonished Paredes that he *could* be deported as a result of his plea.

There was no testimony at the 2006 hearing on the motion to vacate that the prosecutor had promised Paredes anything other than that the court would issue a JRAD. In fact, when asked at the hearing before Judge Arreola whether she had agreed that Paredes would not be deported, Saake testified that she had not expressly made such an agreement. Further, given Congress's authority to change federal immigration law retroactively (*Yacoubian, supra,* 24 F.3d at p. 8), Saake did not have the legal authority to promise Paredes that he would never be deported on the basis of his conviction in this case. (See *United States v. O'Rourke* (8th Cir. 1954) 213 F.2d 759, 763 ["As an alien, DeLuca could not acquire a right to permanent residence in the United States which Congress was bound to respect, nor could the United States Attorney or the District Judge [in issuing a JRAD] impair the power of Congress to provide for the deportation of aliens whom it considered undesirable."].) The fact that Saake did not have the legal authority to

preclude the federal government from ever deporting Paredes supports the conclusion that she made no such promise.

Unlike *Arata*, in which the court found that an "implied term[]" of the plea bargain was that a state law affording expungement relief would remain available to the defendant after his plea (*Arata, supra*, 151 Cal.App.4th at p. 787), in this case, there is no basis for concluding that the plea agreement contains either an express or implied promise of "no deportation." Accordingly, we conclude that the trial court erred in its determination that the postconviction changes in federal law that rendered Paredes potentially removable resulted in a violation of the plea agreement. In light of the lack of any violation of the plea agreement, we further conclude that the trial court erred in "correct[ing] [Paredes's] sentence to reflect the terms of the plea bargain," and also erred in, alternatively, "allow[ing] the plea to be withdrawn."

■ It is unclear from the trial court's conclusions of law whether the court concluded that the sentencing judge had violated section 1016.5 in taking Paredes's plea, as an alternate basis for affording Paredes relief. To the extent that the trial court reached such a conclusion, we disagree. Section 1016.5 requires that prior to accepting a plea of guilty or nolo contendere, a judge advise the defendant as follows: "If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." (§ 1016.5.) Prior to accepting Paredes's plea, the sentencing judge admonished Paredes pursuant to section 1016.5. Thus, the sentencing judge complied with section 1016.5. (*Borja, supra*, 95 Cal.App.4th at pp. 485–486.)

Accordingly, we conclude that the trial court erred in granting Paredes's motion.[9]

---

[9] We emphasize that this appeal does not present the issue whether changes in federal immigration law may constitutionally be applied retroactively to a defendant who pled guilty in reliance on federal law as it existed at the time he entered his guilty plea. (Cf. *U.S. v. Hovsepian, supra*, 359 F.3d at p. 1157 & fn. 6 [concluding that retroactive change in law that rendered defendant deportable could be applied notwithstanding JRAD where defendant was found guilty after trial, and noting that defendant "did not waive any constitutional rights in reliance on the possibility of favorable immigration consequences"].) That question is one that Paredes may raise in immigration proceedings in federal court. (*Borja, supra*, 95 Cal.App.4th at p. 486.) In this appeal we decide only that the application of changes in federal law to Paredes does not constitute a violation of his plea agreement.

## IV.

## DISPOSITION

The trial court's January 4, 2007 order is reversed. The matter is remanded to the trial court with directions to enter an order denying Paredes's motion.

Nares, Acting P. J., and McIntyre, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 11, 2008, S162375.