Filed 12/27/23  P. v. Taylor CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ED TAYLOR,<br><br>　　Defendant and Appellant. | A164446<br><br>(Mendocino County Super. Ct. No. SCUKCRCR202035040) |

　　A jury convicted Robert Ed Taylor of first degree burglary based on evidence that he took "about $800" from a Motel 6 room occupied as a residence by two people.  The trial court sentenced Taylor, now age 63, to a term of 25 years to life, enhanced by the Three Strikes law.  (Pen. Code, §§ 667, subd. (e)(2)(A), 1170.12, subd. (c)(2)(A).)[1]

　　The trial court imposed the lengthy sentence against an unusual procedural backdrop, which forms the primary basis for Taylor's appeal.

---

[1] Undesignated statutory references are to the Penal Code.  "The 'Three Strikes' law provides that for a defendant convicted of a felony who has sustained two or more qualifying prior felony convictions—commonly known as strikes—'the term for the current felony conviction shall be an indeterminate term of life imprisonment,' with the 'minimum term . . .' being the greatest of three options" (*People v. Acosta* (2002) 29 Cal.4th 105, 108), one of which is 25 years (§§ 667, subd. (e)(2)(A)(ii), 1170.12, subd. (c)(2)(A)(ii)).

1

Before trial, Taylor had reached an agreement with the People. The People had agreed to dismiss three of the four prior strikes they had charged. Taylor would submit to a bench rather than jury trial. And the People could rely on testimony from Taylor's preliminary hearing, including hearsay, without re-calling witnesses.

Based on discussions prior to the bench trial, however, the trial court concluded that the parties disagreed on the basic terms of the agreement and that the court could not enforce it. The court attempted to restore the status quo by resetting the matter for a jury trial at which all the rules of evidence would apply. The People used a new information to re-charge the three prior strikes that the People had dismissed under the agreement, and to allege two additional prior strikes not charged in the original information.

Taylor contends the court erred by refusing to enforce the agreement. Specifically, he argues the court lacked jurisdiction to reinstate the strike allegations it had dismissed pursuant to the agreement. He also contends the trial court abused its discretion by not dismissing the prior strikes in the interests of justice. Taylor further argues that a 25-year-to-life sentence is so grossly disproportionate to his offense that it amounts to cruel or unusual punishment under the California Constitution.

We find the trial court properly restored the status quo when Taylor repudiated the parties' agreement, including by reinstating the prior strikes that had previously been charged. The court's decision was not jurisdictional error. We agree, however, that Taylor's sentence was not appropriate and that strikes should be dismissed in the interests of justice. We remand for resentencing.

# BACKGROUND

## A. *Taylor's $800 Burglary at a Motel 6*

In May 2020, Ashlee J. and Will R. lived together at the Motel 6 North in Ukiah.[2] On the night of May 7, they went out to get food, leaving the door to their room open, but returned because Will had forgotten his wallet. Will lingered in the car while Ashlee went up the stairs to their room.

Ashlee stopped on the stairs to talk to someone. When she looked up, she saw Taylor in the room and called Will. Neither Ashlee nor Will had ever seen Taylor before or given him permission to enter their room. Will ran past Ashlee up the stairs and saw that their room was "ransacked." Will asked Taylor what he was doing there and punched Taylor in the face. Will "push[ed] [Taylor] towards the stairway to go downstairs."

Ashlee noticed that about $800 was missing from her purse in the room. She told Will that the money was missing and called 911 to report the theft. Meanwhile, Will threw two bags off the balcony, which Taylor picked up. Will then ran down the stairs to confront Taylor in the parking lot. Will "t[ook] a knee" and went through Taylor's bags, and he asked Taylor to empty his bags and pocket. Taylor pulled out $800 and gave it to Will.

An officer responded to Ashlee's 911 call and found Taylor walking in the area. Taylor denied he was coming from the Motel 6. Taylor said he was walking from "the college" (nearby Mendocino College), which the officer found strange because it was "1:00 o'clock, 12:00 o'clock in the morning." Deputy Sheriff August Kinney arrived, read Taylor his Miranda rights, and arrested him. The officers discovered a Motel 6 room card in one of Taylor's pockets, which the investigation later determined to be an invalid card to

---

[2] The factual background concerning Taylor's burglary comes from the jury trial transcript.

3

Ashlee and Will's room.  Deputy Kinney obtained video from a security camera, which showed Taylor entering and exiting Ashlee and Will's room multiple times; he stayed inside the room for over 25 minutes before Ashlee found him and Will confronted him.

## B. *The Charges and the Agreement*

The People charged Taylor with first degree burglary.  (§§ 459, 460, subd. (a).)  They alleged four prior strike convictions:  two for making criminal threats in 2016 (§ 422), one for second degree robbery with a firearm in 1989 (§§ 211, 12022.5), and one for robbery with a firearm in 1979 (*ibid*.).  While in custody, Taylor refused to appear in court on several occasions, refused to speak with a doctor for a competency evaluation, and filed several motions under *People v. Marsden* (1970) 2 Cal.3d 118 to dismiss his counsel, which the trial court denied.

The court held a preliminary hearing on July 28, 2020.  Deputy Kinney and Taylor himself were the only witnesses to testify.  Deputy Kinney recounted his investigation and his conversations with Ashlee and Will, which included a discussion of their use of the motel room as a residence and their interactions with Taylor on the night in question.  Taylor testified that he "was employed by Motel 6 painting homes by Michael, the owner of the place."  Taylor said he "rented the room" he had entered with another person, and that he "got a call that said to go by my room and close my door."  Taylor stated he had a key to room 249.  Ashlee and Will's room, where they found Taylor, was number 236.  Taylor said that he entered to "make sure all the property was in the room."  He testified the $800 he had with him was his own, from his work painting at the motel.

After hearing this evidence and viewing a 55-minute security camera video of the incident, the court found sufficient evidence to hold Taylor to

4

answer for first degree burglary. The People filed an information charging Taylor with that offense and re-alleging the four prior strikes set forth in the original complaint. Taylor pled not guilty and denied all of the strike allegations.

On October 2, 2020, the court and counsel discussed the terms of an agreement. Taylor faced a sentence of 25 years to life as a consequence of his prior strikes. The prosecutor agreed to "take that 25-year-to-life potential off the table" if Taylor: "one, waives jury trial and [lets] us go by way of court trial"; "[t]wo, he admits the first strike allegation, which is the 422 conviction" (for making criminal threats); and if Taylor was convicted, "he would take the . . . mitigated aspect off the table," meaning his "exposure would either be 8 . . . or 12 years." During the bench trial, "the preliminary hearing transcript would be admissible with no objection to hearsay. The [video] evidence that was used at that preliminary hearing would also come in. . . . Additional evidence could come in, the defendant could choose to testify, though he [doesn't have] to testify." "[I]f believed," the evidence in the preliminary hearing transcript "would be proof beyond a reasonable doubt," although Taylor was not admitting guilt.

Taylor and his counsel expressed their agreement to the terms the prosecutor described. The trial court proceeded to take Taylor's waiver of his right to a jury trial, which his counsel joined. The court next discussed Taylor's waiver of the confrontation clause. The prosecutor stated, "Judge, let it also be in this case, not completely, but possibly a limited waiver of the right of confrontation . . . . He doesn't have to waive it completely, but to the extent that the preliminary hearing transcript will be used as evidence, as I have outlined there has to be a waiver of confrontation." The court and Taylor then had a colloquy: "So, Mr. Taylor, another aspect of this agreement

5

is that at the court trial, . . . the transcript from the preliminary hearing can be admitted as evidence, which will allow the court to read the transcript and accept the testimony that was at the preliminary hearing without having necessarily those witnesses come to court and testify at the court trial.  [¶] Do you understand that?"  Taylor stated, "Yes your Honor."  The court explained that any video or other evidence presented at the preliminary hearing could be introduced at the court trial, and Taylor said he understood.  Following an exchange with counsel, the court asked:  "So, Mr. Taylor, . . . you are agreeing that [the evidence presented at the preliminary hearing] is admissible at the court trial and some of th[at] evidence . . . may have been hearsay, and you are giving up your right to object to that hearsay testimony at your court trial.  [¶] Do you understand that?"  Taylor stated, "Yes your Honor."  The court concluded, "So are you understanding that you are giving up your right to confrontation so far as we had explained it?"  Taylor again agreed.

The trial court then stated that it would take Taylor's admission to the first strike allegation and would "go ahead [and] implement that part of the agreement."  The court accepted Taylor's admission and associated waivers. The prosecutor stated, "Based on that admission . . . I am going to ask the court to strike pursuant to this whole bargain the second, third and fourth strike allegations which in practicality takes three strikes off the table."  The trial court granted the People's motion and dismissed the second, third, and fourth strikes.  It scheduled the bench trial for October 13, 2020.

## C. *Trial Is Delayed and Taylor Refuses to Enter a Further Waiver*

On the day of the scheduled court trial, Taylor's counsel requested a competency evaluation and so the court vacated the trial date.  The court ultimately found Taylor competent to stand trial and reinstated the proceedings on December 18, 2020.

The court re-confirmed that Taylor understood he was waiving his right to a jury trial per the parties' agreement. The prosecutor explained that "what we've agreed to is that the evidence could include the testimony from the preliminary hearing without hearsay objections." Taylor's counsel agreed, but Taylor said, "What do you mean by that? The plaintiffs never came to the preliminary hearing . . . . [¶] The only one that came to the preliminary hearing was the officer. . . ." The prosecutor stated, "It was all the testimony received without a hearsay objection," both "the witness's testimony, and the officer's testimony given." Taylor protested: "There was only one person that took the stand . . . and that was the officer. The witnesses didn't show up at court at all." The court replied, "So I am going to let your lawyer go ahead and explain it again to you when he sees you or meets with you, whenever that happens." The court rescheduled the bench trial for January 6, 2021.

The parties appeared late in the day on January 6, and the court stated that the trial would be delayed "because of the volume of court proceedings today." At this point, the prosecutor expressed a concern that "[t]here's waivers that have to be entered" to effectuate the parties' agreement and "we don't have those in place." The prosecutor stated, "I don't have a feeling we're going to get those in place, and so I don't believe the procedure set up has resulted in a meeting of the minds." The prosecutor explained, "[T]he defense has said that he has a right to confront witnesses, and the—the reality is the procedure in place cannot go forward unless there's a waiver of confrontation."

The court stated that while it believed it had adequate jury trial waivers from both parties, it must also take waivers of "the right to confront and cross-examine witnesses, and the right against self-incrimination.

7

Neither waiver did I take.  So unless those waivers want to be entered today, I don't think we have a deal."  Taylor's counsel objected, "Your Honor, I believe we had a deal.  I don't believe there's a basis for withdrawing that deal. . . ."  The court continued the matter "to think about it before I decide that" the parties' agreement "has to be set aside.  I'm not prepared to make that ruling today."

At a hearing the next day, the trial court summarized the history of the case, including its view that because the parties "would be stipulating to testimony presented at the preliminary hearing . . . whoever those people are . . . that testified at the preliminary hearing would not be testifying at the court trial which would require a waiver of the right to confront and cross-examine witnesses."  Taylor's counsel stated that Taylor would not enter these waivers.  The parties debated whether the agreement amounted to a "slow plea" (pursuant to which the parties agree to a bench trial with agreements concerning the use of evidence to expedite the trial, and with the understanding the defendant is likely to be found guilty (see *People v. Morelos* (2022) 13 Cal.5th 722, 744)), or was a procedural agreement for a "shortened court trial."  Taylor's counsel explained:  "There, I think, may be a misassumption that we are proceeding on a . . . slow plea.  That is not the case.  For this to be a slow plea, Mr. Taylor would have essentially had to acquiesce to his guilt in this matter . . . ."  Taylor's counsel stated that the parties had instead agreed to "a shortened court trial."  "Mr. Taylor entered into an agreement . . . that the preliminary transcript would be permitted to come in without objection to hearsay.  I made a specific record on that day that that and only that was going to be agreed to . . . .  In all other respects Mr. Taylor asserted his right to have a traditional trial, albeit a court trial . . . ."  Taylor's counsel insisted that there was no need "to take any kind

8

of waiver of Mr. Taylor's right of confrontation . . . ."  According to Taylor's counsel, "At no point that day did we attempt to take a waiver of Mr. Taylor's right to confrontation . . . because we were not entering into a court trial predicated on Mr. Taylor's admission of guilt."

The prosecutor maintained that the agreement was a form of "slow plea," which did not necessarily require an admission of guilt—and in any event, "we can't do the procedure that counsel is suggesting without the waivers that they say they're not entering."  The prosecutor concluded, "we do not have a meeting of the minds."  "So I'm asking the court to put the parties back in their . . . status quo and let's set it for a jury trial."

The court agreed.  It said:  "I don't think there was a true meeting of the minds in October regarding the type of proceeding we were all going forward with."  "[T]his notion that it was a shortened court trial did require a stipulation that the preliminary hearing testimony would come in without objection.  Now, you may say it was . . . without a hearsay objection, so maybe you're harboring a different kind of objection.  But my understanding of it certainly was it was coming in without objection which would require a waiver of his right to confront whatever witness testified at the preliminary hearing."

Taylor's counsel again objected.  He argued that the parties reached an agreement in October, and he objected "to the court's decision to relieve the prosecution of its obligation to conduct the trial and to allow it to withdraw the [jury trial] waiver."  The court responded, "I am sincerely hoping that counsel can talk with one another and possibly put this agreement back together," but "at the time I took the waiver of jury, I don't think I took the right waivers regarding everything else," so "there's an error sewn into the record."  Taylor's counsel then suggested Taylor would be willing to enter

9

some type of confrontation waiver, but not a "blanket" one. The court replied, "let's just call it out what we're talking about. . . . [W]e had one or more law enforcement officers come to the preliminary hearing and give Prop 115 testimony.[3] . . . Now we've designed a method to have a court trial . . . where that same testimony would come in, and Mr. Taylor would have to waive his right not only that the officers' testimony comes in but any statements by any witness that the officer [gave] . . . at the preliminary hearing would also come in . . . and he'd be waiving his right to see and hear the witnesses testify that the officer was quoting . . . . He would also have to [waive] his right to confront witnesses and have you cross-examine them. . . ." The court confirmed, "[A]m I being clear?" Taylor's counsel responded that the court was being clear. The court asked, "So is he prepared to do that?" Taylor's counsel responded, "No."

The court concluded, "All right. Then we definitely don't have a meeting of the minds because that was . . . fundamentally a premise that the court was proceeding on that the underlying witnesses who were quoted . . . at the preliminary hearing by a sworn peace officer, that their statements would come in for the truth of the matter without objection." The court set the agreement aside and scheduled a jury trial.

**D. *Taylor Is Convicted and Sentenced Under the Three Strikes Law***

On April 5, 2021, the People filed an amended information, again charging Taylor with first degree burglary, re-alleging the four strikes from the original information, and newly alleging two additional strikes: one from 2001 for assault with a deadly weapon with infliction of great bodily injury

---

[3] Under Proposition 115, voters added section 872, subdivision (b) to allow peace officers with special training (or with five or more years of experience) to provide hearsay testimony during preliminary hearings. (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 197.)

(§§ 245, subd. (a)(1), 12022.7, subd. (a)) and one from 1979 for robbery (§ 211). Trial began that same day. Taylor again testified in his own defense. He now claimed that he went to the Motel 6 to buy marijuana from Will but said Will was high on methamphetamine and accused Taylor of stealing drugs from him. Taylor said his testimony at the preliminary hearing was different because he was giving "all kinds of crazy answers because [he] was upset" and "was just saying anything to get them to change this trial."

The jury returned a guilty verdict on the burglary charge on April 15. At a separate court trial, the court found the allegations of Taylor's six prior strike convictions were true.

Taylor moved for a new trial. He argued that the court did not have jurisdiction to find he had more than one prior strike conviction "after already having stuck those allegations pursuant to the motion of the District Attorney and Penal Code section 1385." In his briefing on that motion, Taylor noted, "The court has authority under [section] 1385 to dismiss a prosecution in the 'furtherance of justice' at any time," argued that the court presumably engaged in this analysis at the time his strikes were dismissed and should not have "undo[ne] the striking of prior strikes . . . without proper process," and summarized the facts he claimed supported dismissing the strikes in furtherance of justice. Separately, Taylor moved for a ruling that a life sentence for his burglary conviction would constitute cruel or unusual punishment under the California Constitution.

The court denied both motions. At the hearing on the motion for a new trial, the court stated, "I don't find that there is sufficient evidence . . . based on the [totality] of the evidence that I have reviewed in this case as to the 1385."

11

On January 19, 2022, the court sentenced Taylor to a term of 25 years to life imprisonment under the Three Strikes law. Taylor appealed.

## DISCUSSION

Taylor argues that in October 2020, the trial court properly dismissed his prior strikes in furtherance of justice pursuant to section 1385. He contends that in January 2021, the court misinterpreted the parties' agreement and erroneously found additional waivers were required to effectuate it. The court's conclusion allowed the People to "simply renege[] on [the] agreement." Taylor further argues that the court lacked jurisdiction to reinstate the prior strikes at that point. Next, Taylor contends that even if the court properly reinstated his strikes before trial, it abused its discretion by failing to dismiss the strikes in furtherance of justice as invited by his motion for a new trial. He raises a further challenge to his sentence under article I, section 17 of the California Constitution, which bars cruel or unusual punishment.

As we explain below, Taylor repudiated a material term of the parties' proposed submission procedure. The trial court properly restored the status quo as a result. Section 871.5, on which Taylor relies for his jurisdictional argument, does not apply under the facts of this case. We agree, however, that justice requires five of Taylor's six charged prior strikes be dismissed. The trial court abused its discretion by finding otherwise.

## I. Restoring the Status Quo Prior to Trial

While the parties have debated whether to call it a "slow plea" or something else, the label does not matter—the trial court dismissed Taylor's strikes in October 2020 pursuant to an agreement between the parties, which the court called "a form of resolution." Like a plea agreement, this was "a form of contract," and must be "interpreted according to general contract

12

principles." (*People v. Shelton* (2006) 37 Cal.4th 759, 767.) On appeal, if the terms of the agreement as recited on the record are clear and explicit, they govern. (*Ibid.*) If there is any ambiguity, we consider the circumstances under which the disputed term was made and the matter to which it relates "to determine the sense in which the prosecutor and the trial court (the promisors) believed, at the time of making it, that defendant (the promisee) understood it." (*Id.* at pp. 767–768.)

Our review is therefore de novo unless interpreting the agreement turns on the credibility of extrinsic evidence. (*People v. Paredes* (2008) 160 Cal.App.4th 496, 507.) We review a determination that the defendant breached an agreement with the People for substantial evidence. (See *People v. Fuentes* (2023) 87 Cal.App.5th 1286, 1302–1303.)

The terms of the agreement were not ambiguous to counsel or the trial court. When the parties put their agreement on the record in October 2020, the prosecutor said that "to the extent that the preliminary hearing transcript will be used as evidence, as I have outlined there has to be a waiver of confrontation." The court explained to Taylor that it would "accept the testimony that was at the preliminary hearing without having necessarily those witnesses come to court and testify at the court trial." The court clarified that "some of th[at] evidence . . . may have been hearsay, and you are giving up your right to object to that hearsay testimony at your court trial" and "you are giving up your right to confrontation so far as we had explained it."

It does seem possible that Taylor, as a layperson, just did not understand what it would mean to allow the use of the preliminary hearing testimony at the anticipated bench trial. Neither Will nor Ashlee had appeared to testify at the preliminary hearing. It is possible that Taylor

13

believed his attorney would get the chance to examine them at the bench trial even if the People could use the preliminary hearing testimony from Deputy Kinney about what Will and Ashlee had told Kinney. As the court explained at length when the deal broke down, however, it was a "fundamental[] . . . premise" that the statements of "the underlying witnesses . . . would come in for the truth of the matter without objection."

Whether or not the agreement was ambiguous, by late 2020 and early 2021, Taylor did not agree to a bench trial without the right to examine Will and Ashlee. At the December 2020 hearing addressing the parameters of the court trial, Taylor twice interjected to protest that Ashlee and Will "never came to the preliminary hearing . . . . [¶] The only one that came to the preliminary hearing was the officer. . . ." The court continued the matter to let Taylor's counsel "explain it again to [him]," then continued the matter again "to think about it before I decide that" the parties' agreement "has to be set aside." Before making that ruling, the court very specifically asked if Taylor was willing to waive his right to confront "the witnesses . . . that the officer was quoting" and Taylor's counsel answered, "No."

Taylor urges the waivers the trial court already took back in October 2020 were sufficient, and claims the court improperly demanded waivers "as to the *entire* court trial" at the January 2021 hearing rather than some more limited alternative. To the contrary, the court did not seek a "blanket" waiver of the confrontation clause, but focused on whether Taylor agreed to a waiver as to Ashlee and Will's statements as related by Deputy Kinney during his preliminary hearing testimony. Whether or not the October 2020 waivers had been sufficient, Taylor now rejected this fundamental premise of the submission procedure the parties had contemplated. He either breached

14

the agreement or else there had simply been no meeting of the minds in the first place.

"When either the prosecution or the defendant is deprived of benefits for which it has bargained, corresponding relief will lie from concessions made." (*People v. Collins* (1978) 21 Cal.3d 208, 214.) "The goal in providing a remedy for breach of the bargain is to redress the harm caused by the violation without prejudicing either party or curtailing the normal sentencing discretion of the trial judge. The remedy chosen will vary depending on the circumstances of each case." (*People v. Mancheno* (1982) 32 Cal.3d 855, 860.) "The usual remedies for violation of a plea bargain are to allow defendant to withdraw the plea and go to trial on the original charges, or to specifically enforce the plea bargain." (*Id.* at pp. 860–861.)

Here, the court could not specifically enforce the parties' agreement by forcing Taylor to involuntarily waive his constitutional rights and coerce a slow plea (or procedural agreement). Nor could it alter the agreement's terms over the People's objection to become more favorable to Taylor, allowing him to maintain his right to confront Ashlee and Will at the bench trial. (See *People v. Stamps* (2020) 9 Cal.5th 685, 701.)

Under the circumstances, the court could allow the People to withdraw from the agreement and restore the parties to their status quo. (See *People v. Collins*, *supra*, 21 Cal.3d at pp. 214–215 ["when the defendant withdraws his guilty plea or otherwise succeeds in attacking it, counts dismissed pursuant to a plea bargain may be restored"], citing *In re Sutherland* (1972) 6 Cal.3d 666, 672 ["Since by granting relief we are in effect permitting defendant to withdraw his guilty plea, the ends of justice require that the *status quo ante* be restored by reviving the four dismissed counts"]; see also *People v. Cantu*

15

(2010) 183 Cal.App.4th 604, 607 [before defendant pleads guilty or otherwise detrimentally relies on a bargain, the People may withdraw from it].)

## II.  Section 871.5

Taylor argues that the trial court lacked jurisdiction to allow the People to reinstate Taylor's prior strikes, and add new strikes, via a new information.  Taylor argues the People failed to file a timely motion pursuant to section 871.5.  Taylor also relies on *People v. Dethloff* (1992) 9 Cal.App.4th 620 (*Dethloff*).

Section 871.5 provides in relevant part:  "(a) When an action is dismissed by a magistrate pursuant to Section 859b, 861, 871, 1008, 1381, 1381.5, 1385, 1387, or 1389 of this code . . . or a portion thereof is dismissed pursuant to those same sections which may not be charged by information under Section 739, the prosecutor may make a motion in the superior court within 15 days to compel the magistrate to reinstate the complaint or a portion thereof and to reinstate the custodial status of the defendant under the same terms and conditions as when the defendant last appeared before the magistrate.  [¶] (b) Notice of the motion shall be made to the defendant and the magistrate.  The only ground for the motion shall be that, as a matter of law, the magistrate erroneously dismissed the action or a portion thereof."  (§ 871.5, subds. (a), (b).)

Section 871.5 does not appear to apply to the facts here.  First, the trial court had not "erroneously dismissed the action or a portion" of it.  Second, the strikes could also be (and were) alleged by information.  (See § 871.5, subd. (a) [section 871.5 applies when part of an action "is dismissed . . . pursuant to [section 1385 and other stated] sections *which may not be charged by information*"], italics added.)  Third, in addition to re-alleging the three dismissed strikes, the People alleged two new strikes in their new

16

information.  Taylor does not argue that adding these strikes was barred by section 871.5.[4]

Neither section 871.5 nor *Dethloff* concerns the trial court's jurisdiction to remedy a defendant's breach of an agreement with the People, which does not depend on specific statutory authority.  (See *People v. Collins* (1996) 45 Cal.App.4th 849, 863–864.)  Further, the *Dethloff* decision is distinguishable because the charges at issue had been dismissed due to insufficient evidence at a preliminary hearing.  (See *Dethloff*, *supra*, 9 Cal.App.4th at p. 623.)  The court did not hold that the People must use a section 871.5 motion to seek reinstatement of strikes dismissed under section 1385, as opposed to re-alleging those strikes in an amended information.  In sum, the trial court correctly interpreted the parties' agreement and provided an appropriate remedy when it became apparent that either the parties had never had a meeting of the minds or else that Taylor had repudiated the agreement.

## III.  Striking Strikes in Furtherance of Justice

"[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion."[5]

---

[4] Taylor did not oppose the addition of the two new strikes below and did not address it in his opening brief on appeal.  In his reply brief, he argues that charging the new strikes was improper only in response to the People's argument that any error in reviving the three dismissed strikes was harmless, which we need not address.  Even if section 871.5 somehow applied here, the People still would have alleged and proved three strikes for purposes of sentencing under section 667 (the strike that had never been dismissed plus the two new strikes in the new information).

[5] Taylor did raise the interests of justice under section 1385 in his motion for new trial.  We decline to find that he forfeited this argument by virtue of the fact that his brief focused primarily on the jurisdictional question under section 871.5.  Even if he had forfeited the argument, we could still reach the merits.  (See *People v. Monroe* (2022) 85 Cal.App.5th 393, 400.)

(*People v. Carmony* (2004) 33 Cal.4th 367, 375.)  The discretion of a trial judge " ' "is subject to the . . . legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.  [Citation.]" ' " (*People v. Jacobs* (2007) 156 Cal.App.4th 728, 740, quoting *Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355.)  " '[T]he 'legal principles that govern the subject of discretionary action vary greatly with context' " and derive from the " 'statutes under which discretion is conferred.' " (*Jacobs*, at p. 737.)

The Three Strikes law "creates a strong presumption that any sentence that conforms to [its] sentencing norms is both rational and proper."  (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.)  But there are extraordinary circumstances where, " 'in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' " (*Id.* at p. 377, quoting *People v. Williams* (1998) 17 Cal.4th 148, 161.)  In "an extraordinary case—where the relevant factors described in *Williams* . . . manifestly support the striking of a prior conviction and no reasonable minds could differ—the failure to strike would constitute an abuse of discretion."  (*Carmony*, at p. 378.)  Unfortunately, this is such a case.

The disparity between Taylor's wrongful actions and his 25-year-to-life sentence is distressing in a way reminiscent of the concerns expressed about the shortcomings of the Three Strikes law in the days leading up to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.  Taylor's burglary was non-violent.  He immediately returned the $800 he had stolen when confronted.

18

Based on the record of the jury trial, his crime appears opportunistic rather than calculated. The security video shows that the door to Ashlee and Will's room was left open when they departed, and that Taylor went in and out of the room slowly during the offense. When Ashlee and Will returned and discovered Taylor in their room, Taylor "came out of the room" and Will "punched him in the face." Taylor did not hit back. Taylor went downstairs, leaving his belongings behind, and Will confronted him and went through Taylor's bags. Again, Taylor did not fight back. Will asked Taylor to empty all of his bags, and "he did." Will asked Taylor what was in his pocket and "he pulled out the money and he gave it to [Will]." Others were present from the moment Ashlee observed Taylor in her room until "neighbors" of Ashlee and Will "start[ed] to surround [them]" as Will confronted Taylor. Ashlee and Will did not say they were frightened by the burglary.

While Taylor's actions caused a conflict that could have resulted in others getting hurt, and while his testimony lacked any credibility, we must focus on "the crime actually committed, not a crime that might have occurred." (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1142.) Ultimately, Taylor's behavior was not violent or threatening, and no one was hurt other than Taylor himself.

We also consider Taylor's prior strikes and personal background. The remoteness of the majority of his strikes—four of which occurred in 2001 or much earlier, including two when Taylor was a youth—is a factor in mitigation. (*People v. Avila, supra*, 57 Cal.App.5th at p. 1141.) Neither of Taylor's two more recent strikes for criminal threats involved violence, and these occurred during a time when a probation report characterized Taylor as "delusional." The record reflects that Taylor has periodically suffered from related mental health issues since at least 2015, and likely for much longer.

(See *id.* at pp. 1143–1144.) While Taylor may have been a "career criminal" decades ago, his recent offenses appear uncalculated and related to his mental health struggles, for which he has accepted treatment over the years. (See *id.* at pp. 1144–1145.) We must also consider his age—over 60 years old at the time he was convicted. (See *id.* at p. 1144.)

Residential burglary is a serious felony. We do not trivialize the feelings of "violat[ion]" that Ashlee and Will experienced in this case upon discovering that Taylor had "ransacked" their room and "gone through . . . personal belonging[s]." Still, given Taylor's persistently non-violent behavior during the offense and the other circumstances discussed above, no reasonable person could view the Three Strikes sentence imposed here as just.

We observe that before Taylor derailed the anticipated bench trial, the People and the trial court had agreed that Taylor ought not be sentenced as a Three Strikes offender. While the court appropriately restored the status quo when the People lost out on the deal they sought in exchange for dismissing strikes off the bat, Taylor's assertion of his right to confrontation should not have so altered the interests of justice that a 12-year sentence became a 25-year-to-life sentence.[6] The trial court was not in any way bound by the failed agreement between Taylor and the People, but under the circumstances it should have sentenced him as a two-strike offender in furtherance of justice. The 25-year-to-life sentence was unnecessarily punitive under the circumstances.

---

[6] While two of Taylor's six prior strikes were not alleged in the complaint and original information, the parties and the trial court were aware of them at the time they agreed Taylor should be sentenced as a two-strike offender in October 2020.

We remand the matter for the court to resentence Taylor. We need not reach Taylor's argument that the sentence violates the state constitutional proscription against cruel or unusual punishment. (See *People v. Williams* (1976) 16 Cal.3d 663, 667 ["we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us"].)

## DISPOSITION

The sentence is vacated, and the matter is remanded for resentencing with the direction to the trial court to strike all but one of Taylor's prior strike convictions (leaving one under § 422) and to reconsider his sentence.

_____
Markman, J.*


We concur:


_____
Stewart, P.J.


_____
Richman, J.


*People v. Taylor* (A164446)


* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.